**PAVEL et al. v. RICHARD, Sheriff and Tax Collector.**

No. 21.

District Court, W. D. Louisiana, Lake Charles Division.

Dec. 9, 1938.

T. A. Edwards, of Lake Charles, La., and D. C. Bland, of Orange, Tex., for complainant.

Jas. O'Connor, Sr., Asst. Atty. Gen., and August Miceli, Sp. Asst. Atty. Gen., for respondent.

Before FOSTER, Circuit Judge, and DAWKINS and BORAH, District Judges.

DAWKINS, District Judge.

F. J. Pavel, "for himself and for and on behalf of" some nineteen other persons, filed an original petition in this case on November 9, 1938, alleging "There is a common question of law, as well as fact, affecting each of their rights and each of them seek a common relief * * *", against the Sheriff of Cameron Parish, Louisiana, to enjoin the enforcement of

Act No. 256 of the State Legislature of 1938, in so far as it applies to petitioners as non-residents of Louisiana, upon the grounds that it violates provisions of the Federal Constitution.

Substantially the same factual allegations are made as to the ownership, leasing, etc., of the property, as were contained in the suit of the said plaintiff Pavel and others against Pattison, District Attorney, and another reported in 24 F.Supp. 915, decided by this court on the 14th day of September, 1938. No appeal was taken by the State's officers from the ruling in that case. However, the Legislature, at its recent session (1938) passed the Act now complained of, which amended section 4 of earlier Acts (Nos. 133 of 1932, 97 of 1934 and 213 of 1936) which were themselves amendments of the earlier Act (No. 80 of 1926) dealing with the trapping of wild fur-bearing animals and alligators, discussed in the decision of Pavel et al., v. Pattison, D. A., supra. The amendment of 1938, in part, reads as follows:

"Section 4. That there is hereby levied the following licenses on each trapper, buyer, and dealer:

"Any trapper herein defined before commencing business must secure annually from the tax collector of each parish in which he traps, as provided by Section 13 of Act 127 of 1912, a trapper's license, which shall be furnished upon the payment of the sum of two dollars ($2.00) for residents of the State of Louisiana who shall have established a bona fide domicile in the State for more than two years before applying for the said license; and for non-residents and for unnaturalized foreign-born residents, the trapper's license shall be Two Hundred ($200.00) Dollars per annum, conditioned also upon the furnishing of a cash deposit in the sum of Three Hundred ($300.00) Dollars to be deposited with the Department of Conservation to guarantee payment of the Severance Tax on fur provided in Section 3 of this Act. The above mentioned license shall have attached coupons or return cards described in Section 8 herein. On the first of each month, the tax collector shall pay over collections, with reports, less the usual commission paid in the case of State ad valorem taxes in payment for his services to the State Treasurer, who shall then remit same to the Department of Conservation, to be used and expended in aid of fur-bearing animal conservation, without further or special appropriation.

\*    \*    \*    \*    \*    \*

"It shall be a violation of this Act for any trapper, buyer, or dealer to undertake to prosecute their several avocations without having previously procured and paid for the respective licenses herein provided."

Other sections of the earlier Acts as amended provide criminal penalties.

The distinction between the present case and that formerly decided by this court is that there a non-resident was absolutely prohibited from trapping these animals until he had resided in the State for one year; whereas in the amendment now assailed, non-residents can have the privilege by paying an annual license of $200 and depositing the sum of $300 in cash. A residence of two years in the State, instead of one, is required for the citizen of another State, to be exempt from these requirements.

In the original petition in the present case, the Sheriff of Cameron Parish alone was made party, rule to show cause why a temporary injunction should not be granted was issued and the matter set for hearing at New Orleans on November 18, 1938. Thereafter, on November 14th, plaintiff filed an amended bill, seeking to make the Conservation Commissioner of the State, who resides and exercises the duties of his office in the City of New Orleans, in the Eastern District of Louisiana, party hereto. Service upon the Commissioner could not be had because of his absence from the City prior to the hearing on the 18th of November, but an Assistant Attorney General, who was present, at the suggestion of the court, stated he would consent to be entered as appearing for the Commissioner. However, the only pleading actually filed was one by the Sheriff, who moved for a dismissal of the bill, upon the following grounds:

1. To dismiss the action on the ground that the court lacks jurisdiction because the amount actually in controversy is less than three thousand dollars exclusive of interest and costs.

2. To dismiss the action on the ground that this Honorable Court lacks jurisdiction over the subject matter.

3. To dismiss the action on the ground that the Court lacks jurisdiction over the person.

4. To dismiss the action because the complaint fails to state a claim against defendant upon which relief can be granted."

It was also agreed, with the approval of the court, that either side might file affidavits in support of their contentions, to be considered both in connection with the plea to the jurisdiction and on the merits, should the court decide to overrule the exception and the motion to dismiss.

Attached to the original petition filed on November 9th are what purport to be copies of the 19 lease contracts between Pavel and the persons on behalf of whom he alleged he was suing therein, giving description of lands, running for a period of two years from November 5, 1938, and each containing the following provisions:

"The consideration for this grant under this agreement, is that the Lessee herein, is to deliver to the Lessor, one-fourth of all fur so taken from the said animals, or its equivalent in money, if the Lessee sells the fur, and either the said one-fourth of all the fur so taken, or the said one-fourth of the money for which was paid for them at a sale of the said fur, is to be delivered to the Lessor, by the Lessee, on the first of each month after the trapping season opens in the State of Louisiana.

"It is especially understood that the sole and only purpose of this instrument is to Grant, Sell and Convey to the Lessee, all the fur-bearing animals on said land as described, or that can be found on said land in the next two years, and the said Lessee has the right to catch and take any of the said animals for and during the time periods as set out herein."

Neither the original nor amended petitions were verified when filed, but on the day of the hearing, one of plaintiff's counsel, D. C. Bland, executed before the deputy clerk of the Eastern District of Louisiana an affidavit, stating that he had prepared the amended bill (which repeated substantially the allegations of the original, with elaborations) and that all of the facts alleged were true, "to the best of his knowledge, information and belief * * *". With a letter dated November 19th, there were transmitted to the clerk affidavits of Pavel and three of his lessees. Pavel verified the statement in the petition that he is the owner of 14,000 acres of marsh land in Cameron Parish and holds leases on 26,000 more, all of which are suitable for trapping fur-bearing animals and alligators; that he now has "from 5,000 to 6,000 acres under lease" to his co-plaintiffs; that unless his lessees can trap during the current trapping season, they will have no other means of making a living and he, Pavel, will be deprived of rentals amounting to at least $3,500 for each of the two years the leases are to continue; that for years he has been one of the large taxpayers in Cameron Parish, paying as much as $2,000 a year property taxes and in some years as much as $5,000 severance taxes upon the furs taken from the catch on his lands; that in the year 1922, having had much trouble with local trappers poaching and trespassing on his lands, after prosecuting some ten injunction suits, he succeeded in having his rights recognized and protected; that in retaliation therefor, the local trappers induced the State Legislature to pass the statutes with which he has had to contend in his former suit and the present one; that in the season of 1937–1938, agents of the law enforcement departments of the State, including the Conservation Commissioner, raided his camps, arrested some eight of his trappers, placed them in jail and confiscated their furs, six of whom were convicted and laid their time out in jail; that another succeeded in obtaining an injunction preventing further interference with his operations; that coincident therewith, there were some nineteen other men trapping for another concern "and most of these men who were so trapping for other people, did not even make an effort to live in Louisiana, and none of them were ever arrested or prosecuted;" that after he, Pavel and White, plaintiffs in the former suit, obtained the injunction from this court "declaring Section 5 'The American Exclusion Act' [Act No. 80 of 1926] of keeping landowners in Louisiana, who live in Texas, off their land, these same Conservation agents, local enforcement officers and some of the local trappers, got up 'The American Prevention Act' * * *", No. 256 of 1938, and had it passed, knowing that no trapper was able to comply with it; that compensation for the furs confiscated from his trappers was never paid; that affiant is well acquainted with the trappers in the vicinity, and "that at this season of the year 90% of the said trappers could not raise $500.00 in cash under any circumstances."

Affidavits by the three trappers were to the effect that they had been trapping in Cameron Parish for the past eight to ten years, and that "due to the scarcity of these fur-bearing animals, and low prices,

the average trapper in said Parish who traps on shares, will make from $400.00 to $500.00 as a clear profit in one trapping season"; that they "are well acquainted personally with all of the trappers in Cameron Parish, Louisiana, and except those who own their own lands and with a few other exceptions, none of them could raise $500.00 cash under any circumstances."

Affidavits were also furnished on behalf of respondents by Armand P. Daspit, "Director of Fur and Wild Life of the Department of Conservation", and by Mark Richard, Sheriff of Cameron Parish. The former swore that he is familiar with the conditions in Cameron Parish and that "there are numerous non-resident individuals or corporations who own lands in Cameron Parish and who employ residents of Cameron Parish to trap their lands, and that plaintiff herein, F. J. Pavel, his assignees or sub-lessees, are the only persons employing directly or through lease or sub-lease, non-resident trappers to trap on the lands referred to in the above entitled and numbered cause; that there are between seventy-five and one hundred residents of Cameron Parish, Louisiana, who are competent, reliable and well-known trappers, who are familiar with the fur-trapping lands in that Parish, and who are presently without employment and who are ready and willing to trap on said lands * * *; that by reason of the large number of resident trappers of Louisiana, competition among the resident trappers is so great to secure the trapping rights on the property in question, that F. J. Pavel, as owner, assignee, lessee or sub-lessee, would not lose any profits from his trapping leases by employing resident trappers to trap on the lands in question, rather than non-resident trappers; that the pelts and skins taken from the lands in question are shipped to various points in the State of Louisiana, most of them being shipped directly to dealers in New Orleans and other large cities in Louisiana, while few, if any, of these pelts and skins are shipped directly out of the State of Louisiana"; that some of the said skins are taken beyond the limits of the State without paying the severance tax and this necessitated the passage of Act 256 of 1938, requiring the deposit of $300 to protect the State's said taxes, which is returned to the trapper "at the end of the trapping season, after due proof that the severance taxes * * * have been paid"; that the said trappers would have no difficulty in securing an advance from the owner or lessee to cover the license fee and to make the deposit, "considering the value of the skins and pelts which they removed from the land during the course of the trapping season."

The second affidavit, by the Sheriff of Cameron Parish, is in substance the same as that of Daspit, with respect to the availability of resident trappers, etc.

On the jurisdictional question, there does not appear to be any dispute of the essential facts, which we find as follows:

The plaintiff, Pavel, owns in fee simple some 14,000 acres of marsh land and leases some 26,000 more, which are valuable only for their fur-producing qualities; he has made leases with some nineteen individuals or trappers to trap portions thereof, from which he will realize more than $3,500 for each of the two years the leases have to run, if his non-resident trappers are accorded the same privileges in the State of paying the license fee of $2 instead of $200, and are relieved from making the deposit of $300 required of them; that the other alternatives are to allow his lands to lie idle and untrapped, or to pay the license fees of his lessees aggregating $3,800 and to make deposit for them of a total of $5,700; otherwise he will be compelled to employ resident trappers, which was clearly the purpose of the law, as indicated by the affidavits of respondent's witnesses. There are plenty of resident trappers to whom Pavel could lease or employ to trap his lands. None of those with whom Pavel has leases is able to comply with the requirements of the law.

In these circumstances, what is the measure of the jurisdictional amount involved?

Putting aside for the moment the question of the rights of the persons on whose "behalf" Pavell sues, and considering the matter only as to him, if he has the right under the Constitution and laws of the United States to lease his lands to or to employ as trappers anyone he may desire, including non-residents of the State, then it would seem that he, Pavel, should be permitted to defend that right in any court having jurisdiction of the parties, if the value of its unhampered enjoyment to him exceeds the minimum amount necessary to the exercise of its powers by the court to which he appeals. The correctness of his contention as to the invalidity of the stat-

ute need not be considered in determining the issue of jurisdiction. The effect of the statute, according to the petition and affidavits, is to make it impossible for him to lease his lands to or employ a non-resident, particularly those whom he has joined as plaintiffs, for the reason that the amount demanded of them, compared to the resident trapper, is so great they could not profitably operate the leases, notwithstanding they have been so engaged or employed by Pavel for many years. If they attempt to trap without paying the license, which is one hundred times greater than that exacted of residents of the State, and without making the deposit of an additional $300, also not required of citizens of Louisiana, they will be arrested and probably subjected to heavy penalties, which likewise prevents them from performing their contracts with Pavell. Of course, but for their contractual relations with Pavel, this would be no concern of his, but the effect upon his property right is not incidental, but direct, because it compels the breaching of contracts, which, if correct in his contention, he is entitled to have performed without interference of the character intended by the statute. In numerous cases, prior to the decision of the Supreme Court in Healy v. Ratta, 292 U.S. 263, 54 S.Ct. 700, 78 L.Ed. 1248, it had been held that the value of the plaintiff's business or the right to be protected was the criterion for the determination of jurisdiction in actions contesting the validity of license taxes of this character. See C.J., Vol. 15, pp. 753 et seq. and numerous cases cited in foot-note, particularly City of Hutchinson et al. v. Beckham et al., 8 Cir., 118 F. 399; the same conclusion was also reached in the more recent cases of Packard v. Banton, 264 U.S. 140, 44 S.Ct. 257, 68 L.Ed. 596, and Nutt v. Ellerbe, D.C., 56 F.2d 1058; McCormick & Co. v. Brown, D.C., 58 F.2d 994.

Of course the tax is not imposed upon Pavel unless he traps individually; but as pointed out above, it was intended to and does unquestionably have the effect of preventing him from deriving any revenue from his property, except upon condition that he employ residents of the State, or advance the license fees and make the deposits required of his lessees. If, in turn, he exacted of them reimbursement of the license fees, according to their affidavits, this would involve approximately half of their entire earnings for a season and make it utterly impossible to compete with residents of the State.

However, in the case of Healy v. Ratta, supra, the Supreme Court reviewed some of the prior jurisprudence and held that the amount involved in that case was the aggregate of the license fees which the salesmen of the appellee would be compelled to pay in the City of Manchester, where they operated, rather than the gross amount of license fees throughout the State. The appellee contended that this sum of $300 being at the rate of $50 for each of six salesmen, should be capitalized over a period of years and would exceed in that way the $3,000 necessary to give a Federal court jurisdiction. The Supreme Court held this could not be done but the matter had to be considered on the basis of the total amount exacted annually. If the same rule is applied here, then the total amount necessary to pay the license fees of plaintiff's lessees (nineteen in number) would be $3,800, and deducting therefrom $2 each which they would have to pay as residents of the State, would leave $3762,— more than sufficient to sustain the jurisdiction of this court.

Our conclusion is that whether considered from the standpoint of the annual rentals of Pavel's lands which according to his sworn statement, undisputed, amount to the sum of $3,500 a year and will be lost, unless he complies with the statute, or upon the basis of the aggregate license fees, as was done in the Healy-Ratta case, supra, the amount involved as to Pavell exceeds the minimum jurisdiction of this court.

On the merits, it seems clear that the effect of this statute is to deny to Pavel and his employees or lessees operating under the leases, equal protection of the law, in violation of the Federal Constitution. See Ward v. Maryland, 12 Wall. 418, 20 L.Ed. 449, and numerous cases in Rose' Notes, Revised Ed. Vol. 7, pp. 443 et seq.; Booth v. Lloyd et al., C.C., 33 F. 593; United States Constitution, Art. IV, Sec. 2, U.S.C.A.; Chalker v. Birmingham & N. W. R. Co., 249 U.S. 522, 527, 39 S.Ct. 366, 63 L.Ed. 748.

The plaintiff, Pavel, is, therefore, entitled to a writ of injunction to restrain the defendants and their deputies or agents from interfering with the lessees or employees of said plaintiff in the trapping of his said lands on equal terms with residents of the State.